IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IHOP LEASING LLC;<br>DINE BRANDS GLOBAL, INC.; AND<br>FORTY SEVEN EIGHTY ONE COMPANY, INC.,<br><br>          Plaintiffs,<br><br>v.<br><br>PARKINGWAY Q BUSINESS CENTER LLC,<br><br>          Defendant. | C.A. No. 22-CV-10688 |

## COMPLAINT

Plaintiffs IHOP LEASING LLC, DINE BRANDS GLOBAL, INC. AND FORTY SEVEN EIGHTY ONE COMPANY, INC., allege as follows:

## PARTIES

1. Plaintiff IHOP LEASING LLC ("Tenant") is a Delaware limited liability company, with a principal place of business at 450 N. Brand Boulevard, 7th Floor, Glendale, California 91203.

2. Plaintiff DINE BRANDS GLOBAL, INC. ("Dine Brands") is a Delaware corporation with its principal place of business at 450 N. Brand Boulevard, 7th Floor, Glendale, California 91203.

3. Plaintiff FORTY SEVEN EIGHTY ONE COMPANY, INC. ("Subtenant"), is a Nevada corporation with its principal place of business at 25060 Avenue Stanford, Suite 200, Valencia, California 91355.

1

4. Defendant PARKINGWAY Q BUSINESS CENTER LLC ("Landlord") is a Massachusetts limited liability company with its principal place of business at 1512 Hancock Street, Quincy, Massachusetts 02169.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties to this action, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6. This Court has personal jurisdiction over Defendant because, inter alia, it is organized in the Commonwealth of Massachusetts, it transacts business in and/or affecting the Commonwealth of Massachusetts and has knowingly caused the harm identified herein to Plaintiffs in the Commonwealth of Massachusetts.

7. Venue is appropriate in this District pursuant to the provisions of 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

## FACTS

8. Upon information and belief, Landlord owns the land with the four buildings thereon known as "The Parkingway" at 102-241 Parkingway, Quincy, Massachusetts (the "Shopping Center").

9. Pursuant to that certain Lease dated January 23, 2003, as modified by that certain First Amendment to Lease dated May 12, 2003 (as so modified, the "Lease"), by and between Atlantic-Quincy Realty LLC, a Massachusetts limited liability company, predecessor in interest to Landlord, as landlord, and IHOP Properties, Inc., a California corporation, predecessor in interest to Tenant, as tenant, Atlantic Quincy Realty LLC leased to IHOP Properties, Inc., those certain premises consisting of a space of approximately 5,210

square feet (the "Premises") in the building located at 115-119 Parkingway, Quincy, Massachusetts (the "Building"), which Building is one of the four buildings located in the Shopping Center. A copy of said Lease is attached hereto as ***Exhibit 1***.

10. The Building is a single-story building with a basement below the Building (the "Basement"). The Premises occupies the entire space within the Building, except for a smaller space adjacent thereto presently occupied by a tenant operating under the name of "Health Express." Ex. 1, Exhibits A and C thereto.

11. The current term of the Lease expires on April 30, 2028, subject to three (3) options on the part of Tenant to extend the term for five (5) years each. Ex. 1 § 1.2 [as amended by First Amendment to Lease] and § 1.3.

12. Pursuant to that certain Guaranty of Lease dated January 28, 2003 ("Lease Guaranty"), made by IHOP Corp., a Delaware corporation, predecessor in interest to Dine Brands, in favor of Atlantic-Quincy Realty LLC, predecessor in interest to Landlord, IHOP Corp. guaranteed the obligations of the tenant under the Lease.[1]   Ex. 1, Exhibit H thereto.

13. Pursuant to that certain Sublease dated July 24, 2003, by and between Rod MacPherson, aka Rod MacPherson, Jr., predecessor in interest to Subtenant, as subtenant, and IHOP Properties, Inc., a California corporation, predecessor in interest to Tenant, as sublandlord, Rod MacPherson, Jr., subleased the Premises from IHOP Properties, Inc. A copy of said Sublease is attached hereto as ***Exhibit 2***.

14. The current term of the Sublease expires on April 29, 2028, subject to one (1) option on the part of Subtenant to extend the term for a period of ten (10) years.

---

[1] Dine Brands is the indirect corporate parent of Tenant.

Ex. 2 § 1.3.[2]

15. Subtenant operates an IHOP® restaurant at the Premises pursuant to the terms of the Franchise Agreement with IHOP Franchising LLC, a Delaware limited liability company.

16. According to § 1.1, the Sublease provides that:

*Subtenant agrees (i) to be bound by all the provisions of the [Lease], except to the extent those provisions have been expressly modified herein, (ii) that all of the obligations and all sums required to be paid as provided in the [Lease] which are the obligations of Tenant thereunder shall be the obligations of Subtenant, except to the extent those obligations have been expressly modified herein, and (iii) that all such obligations run from Subtenant to Sublandlord as well as to Landlord.*

Ex. 2 § 1.1.

17. The Lease defines the "Common Area" of the Shopping Center as:

*All areas and facilities of the Shopping Center that are provided and designated from time to time for the general use and convenience of Tenant and other tenants and occupants of the Shopping Center, and their respective authorized representatives, employees, customers and other invitees as depicted on <u>Exhibit A</u>. Common Area includes, without limitation, pedestrian walkways and patios, landscaped areas, sidewalks, plazas, thoroughfares, loading areas, parking areas, roads and lighting within the Shopping Center.*

Ex. 1 § 4.2.

18. According to § 5.2(A), the Lease provides that:

*Landlord shall be responsible for maintaining the structure and foundation of the Building and its roof... in the same condition as at the Rent Start Date or as it may be put during the Term of this Lease... Landlord also shall be responsible for maintaining the common areas of the Shopping Center and the Building's systems which serve the common areas or which serve more than one unit in good order and repair, except that Landlord shall have no responsibility with respect to any obligation hereinabove stated if caused by Tenant's negligence or wanton acts.*

---

[2] The Sublease is interdependent with a certain Franchise Agreement dated September 11, 2007 (as amended, the "Franchise Agreement"), between IHOP Franchising LLC, and Subtenant. Section 3.03 of the Franchise Agreement contains a 10-year renewal option on the part of the Franchisee which, if exercised, also renews the term of the Sublease for a corresponding period.

Ex. 1 § 5.2.

19. According to § 9.2, the Lease provides that:

> *Landlord will obtain and maintain so-called 'All Risk' property insurance with a code upgrade endorsement, with an insurance company authorized or admitted to do business in the state in which the Shopping Center is located, for the mutual benefit of the Landlord and its mortgagee, if any, covering the Common Area and the building containing the Premises, in an amount equal to at least one hundred percent (100%) of the full replacement cost thereof. Landlord agrees to maintain such insurance in full force and effect during the Term, at its sole cost and expense, subject to reimbursement as part of Common Area Expenses pursuant to Section 4.1 and 4.2 above.  In the event of fire or other casualty, proceeds of any such policy shall be payable to Landlord and its mortgagee, if any.*

Ex. 1 § 9.2.

20. According to § 10.1, the Lease provides that:

> *If the Premises or any part thereof is partially damaged by fire other casualty, so as not to be untenantable, the damage thereto (except for damage to the Premises' interior finish and build-out and to Tenant's fixtures, property and equipment, for which Tenant shall be responsible) shall be restored by and at the expense of Landlord.…  Such restoration shall be made promptly by Landlord subject to delay which may arise by reason of adjustment of insurance, and for reasonable delay on account of "labor troubles" or any other cause beyond Landlord's control (excluding financial inability).*

Ex. 1 § 10.1.

21. Also according to § 10.1, the Lease provides that:

> *The provisions of this Article 10 shall govern in the case of damage or destruction of the Building or any part thereof and the restoration thereof due to fire or casualty notwithstanding any inconsistent provisions of this Lease.*

Ex. 1 § 10.1.

22. According to § 10.2, the Lease provides that:

> *Landlord and Tenant hereby release each other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by the fire or any to the extended coverage or supplementary contract casualties, even if such fire or other casualty shall have been caused by the fault or negligence of the other party, or anyone for whom such party may be responsible, provided however, that this release shall be applicable and in force and effect only to the extend permitted by law and only with respect to loss or damage occurring during such time as such*

5

> *release does not adversely affect releasor's insurance policies or prejudice the right of the releasors to recover thereunder.*

   Ex. 1 § 10.2.

23. According to § 26.1, the Lease provides that:

   *If any action or proceeding, whether judicial or non-judicial, is commenced with respect to any claim or controversy arising from a breach of this Lease or seeking the interpretation or enforcement of this Lease, including any Exhibits attached hereto, in addition to any and all other relief, the prevailing party or parties in such action or proceeding shall receive and be entitled to recover all costs and expenses, including reasonable attorneys' fees and costs, incurred by on account of or related to such action or proceeding.*

   Ex. 2 § 26.1.

24. On or about October 27, 2021, the Restaurant experienced a power outage as a result of severe storms in the area which caused an area-wide power outage and forced the Restaurant to close for the entire day.

25. On or about October 28, 2021, the Restaurant remained closed due to the power outage. The power was restored at about 7:00 p.m.  The Restaurant reopened on the next day, October 29, 2021.

26. At about 9:00 a.m., on October 29, 2021, the Restaurant manager noticed that the hot water heater had sprung a large leak which caused water to spill into the Basement.  The Restaurant manager called out a plumber to fix the leak and ServPro to clean up the Basement and informed Landlord of the same.  The plumbing repairs were ordered and paid for by Subtenant.  It is believed that the water leak was caused by the lack of heat in the kitchen area of the Restaurant due to the heating system not operating during the power outage.

27. On or about November 11, 2021, Landlord's counsel, Matthew Shayefar, sent Tenant a letter ("Shayefar November 11 Letter") "to put Tenant on notice of its violation of its obligations under the Lease" alleging, *inter alia*, that:

    *On or about October 29, 2021, Tenant's hot water heater burst, releasing massive amounts of steam and water into the basement of the building in which the Premises is a part. This has resulted in significant water and steam damage throughout the basement, for which Tenant is liable... Landlord hereby notifies Tenant of its exercise of its rights under Section 23.2 of the Lease to take any action it deems necessary or desirable or appropriate to remediate the hazardous substances in the building... All amounts paid by Landlord, and all other expenses and costs incurred by Landlord in connection with this repair and remediation efforts, shall be immediately due and payable by Tenant to Landlord on demand as additional rent with interest thereon at the rate of 3% of the prime rate of interest. Landlord will provide its written demand for such payment from time to time as its costs and expenses accrue.*

    A copy of the Shayefar November 11 Letter is attached hereto as ***Exhibit 3***.

28. On or about January 30, 2022, a similar incident occurred as a result of a severe storm system in the area and freezing temperatures, which resulted in the loss of power to the heating system in the Restaurant. Due to frozen fire sprinkler lines, one of the fire sprinklers had broken causing water once again to spill down into the Basement. The Restaurant was forced to close and the Restaurant manager notified Landlord.

29. On or about March 17, 2022, Landlord's counsel sent Tenant a Notice of Breach of the Lease ("March 17 Notice of Breach of Lease"), "putting Tenant formally on notice of its violation of its obligations under the Lease" and reciting a history of alleged occurrences dating back to before September, 2018, involving alleged water leaks from the Restaurant down to the Basement through and including the "latest incident" regarding the broken fire sprinkler line occurring on or about January 30, 2022, and stating:

    *It appears that Tenant failed to heat its back kitchen, which resulted in freezing of the pipes.*

    A copy of the March 17 Notice of Breach of Lease is attached hereto as ***Exhibit 4***.

30. The occurrences alleged in the March 17 Notice of Breach of Lease prior to the hot water heater leak in October, 2021, which included pooling of water in the Basement allegedly from the Restaurant and resulting mold growth, foul odors and damage to the Basement walls, were resolved in one manner or another to the satisfaction of Landlord. However, on information and belief, the source of the water pooling was, in part, water seeping from underground through cracks in the concrete floor of the Basement for which Landlord is solely responsibility and which was wholly unrelated to any issues in the Restaurant.

31. Neither Tenant nor Subtenant intentionally failed to heat the kitchen. The loss of the heating was a result of the loss of power to the heating system in the Restaurant due to the power outage.

32. In the March 17 Notice of Breach of the Lease, Landlord further states:

    *Please note that Landlord will begin immediately remedying the damages caused by Tenant at Tenant's cost as is its right and as permitted under the Lease, including, without limitation, under Section 23.2 of the Lease.*

    *Enclosed herewith are invoices relating to both the October 20, 2021, and January 20, 2022, incidents, totaling $103,807.67, so far. Landlord expects that it will incur further costs as it continues to remedy the damages caused by Tenant and its breaches. Tenant is wholly responsible for these damages.*

    *Without limiting Landlords rights, Landlord hereby demands that Tenant:*

    *(a)     Within five (5) days of the date hereof, pay to Landlord **$103,807.67** for the incurred damages to date arising from Tenant's breach of October 20, 2021, and January 20, 2022. (emphasis is original)*

    *(b)     Take all other action necessary to cease any further damage to the Premises and the Building.*

    Ex. 4.

33. Neither Tenant nor Subtenant has failed to pay any additional rent or other sums payable under the Lease nor has Tenant or Subtenant failed to commence diligently to correct

any default specified in the times required under the Lease as set forth in the Notice of Breach of Lease dated March 17, 2022.

34. Neither Tenant nor Subtenant has any obligation to pay or reimburse Landlord for the costs Landlord incurred or may incur to remediate the water damage to the Basement inasmuch as Landlord released Tenant of any liability or responsibility therefor pursuant to § 10.2 of the Lease and should have looked to its property insurance required to be maintained by Landlord pursuant to § 9.2 of the Lease to cover the costs of such remediation.  Ex. 1 § 9.2 and § 10.2

35. The five (5) day deadline set forth in the March 17 Notice of Breach of Lease was extended by mutual agreement between Landlord's counsel and Subtenant's counsel through and including April 8, 2022.

36. On April 8, 2022, Subtenant's counsel, Joseph London, sent an email to Landlord's counsel ("London April 8 Email") stating the following:

*Following up on my previous email, after further analysis of the Lease and the facts, I have come to the conclusion that the responsibility for the repair of the water damage to the basement area and the cost thereof are that of the Landlord or its insurance carrier for the following reasons (defined terms below correspond to the defined terms in the Lease):*

*1. The basement area is [   ] part of the Building in which the Premises is located.   (Section 1.1)*

*2.  The basement area also is not part of the Common Area, although that is not of particular significance.  (Section 4.2)*

*3. Landlord is responsible for obtaining and maintaining "so-called "All Risk" property insurance with a code upgrade endorsement… covering the Common Area and the building containing the Premises, in an amount equal to at least one hundred percent (100%) of the full replacement cost thereof…at its sole cost and expense, subject to reimbursement as part of Common Area Expenses pursuant to Sections 4.4.1 and 4.4.2 above." (Section 9.2) The water damage to the basement area of the Building falls squarely within the covered risks of an "All Risk" (now referred to as "Special Form") property insurance policy, **the cost of which the Tenant has been billed and has paid its proportionate share**…*

9

*4. Landlord and Tenant have "release[d] each other from any liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties, **even if such fire or other casualty shall have been caused by the fault or negligence of the other party** [bolding added], or anyone for whom such party may be responsible provided…such release does not adversely affect releasor's insurance policies or prejudice the right of the releasors to recover thereunder." Landlord and Tenant are each required to "request its insurance carriers to include in its policies…a clause or endorsement" to that effect in their insurance policies. (Section 10.2)*

A copy of the London April 8 Email is attached hereto as **_Exhibit 5_**.

37. The repair and maintenance of the Building, including the Basement, is the responsibility of Landlord. Ex. 1 § 5.2(A).

38. On or about April 20, 2022, Landlord sent Tenant a Notice of Termination of the Lease ("April 20 Notice of Termination of Lease") stating:

    *This correspondence shall act as notice of termination of the Lease pursuant to Section 15.1 of the Lease arising from, inter alia, Tenant's failure to pay additional rent and other sums payable under the Lease, and Tenant's failure to commence diligently to correct defaults specified, in the times required under the Lease, more as fully set forth in the Notice of Breach dated March 17, 2022.*

    *Tenant is hereby notified that the Lease will be deemed terminated as of **May 5, 2022** and that Tenant must surrender the Premises in accordance with the Lease by such date. (emphasis in original)*

    A copy of the April 29 Notice of Termination of Lease is attached hereto as **_Exhibit 6_**.

39. Neither Tenant nor Subtenant has failed to pay any additional rent or other sums payable under the Lease nor has Tenant or Subtenant failed to commence diligently to correct any default specified in the times required under the Lease as set forth in the Notice of Breach of Lease dated March 17, 2022.

40. Tenant and Subtenant have complied with the terms of the Lease.

10

41. There exists an actual, justiciable case and controversy within the jurisdiction of this Court among the parties regarding the parties' rights and obligations under the Lease.

## COUNT I
### (Breach of Contract)

42. Plaintiffs hereby repeat and incorporate by reference the allegations contained in forgoing paragraphs of this Complaint.

43. The Lease is a valid and binding contract.

44. The Tenant and Subtenant fulfilled all their obligations under the Lease.

45. The Landlord has materially breached the Lease by, *inter alia*, its conduct, as described above, including but not limited to deeming the Lease terminated and demanding that the Tenant and Subtenant surrender the Premises as contrary to the terms of the Lease.

46. As a result of the Landlord's material breach of the Lease, Plaintiffs have been injured and suffered substantial damages.

## COUNT II
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

47. Plaintiffs hereby repeat and incorporate by reference the allegations contained in forgoing paragraphs of this Complaint.

48. The Lease carries with it an implied covenant of good faith and fair dealing.

49. Landlord has breached the implied covenant of good faith and fair dealing contained in the Lease by, *inter alia*, its conduct as described above.

50. As a result of the Landlord's breach of the covenant of good faith and fair dealing contained in the Lease, the Plaintiffs have been injured and suffered substantial damages.

## COUNT III
## (Declaratory Judgment)

51. Plaintiffs hereby repeat and incorporate by reference the allegations contained in forgoing paragraphs of this Complaint.

52. Count III is brought pursuant to 28 U.S.C. § 2201 for a declaratory determination of the rights and obligations of Plaintiffs under the Lease and Lease Guaranty because Tenant and Subtenant have fulfilled their obligations under the Lease.

53. Landlord has improperly asserted that Tenant and Subtenant have breached the Lease by permitting water to pool in the Basement and Landlord has wrongfully sought to void and deprive Tenant and Subtenant of their rights under the Lease.

54. There exists an actual, justiciable case and controversy within the jurisdiction of this Court among the parties regarding the parties' rights and obligations under the Lease and Lease Guaranty.

55. Plaintiffs request that the Court declare the rights, status and other legal relations between the parties.

56. Specifically, Plaintiffs ask this Court to declare that:

    a. Plaintiffs are not obligated to pay or reimburse Landlord for any costs or expenses of remediating or repairing any water damage to the Basement resulting from the occurrences in October, 2021, or January, 2022, described in this Complaint.

    b. Plaintiffs are not in default under the Lease, and the Lease remains in full force and effect.

    c. Plaintiffs are not obligated to pay or reimburse Landlord for any costs of remediating or repairing any water damage to the Basement resulting from the occurrences in October, 2021, and January, 2022, described in this Complaint.

  d. Plaintiffs are the prevailing parties in this action and are entitled to all costs and expenses, including their reasonable attorneys' fees and costs, incurred by them in this action pursuant to § 26.1 of the Lease.

  WHEREFORE, the Plaintiffs respectfully pray that this Court:

A. Enter judgment in favor of Plaintiffs on Counts I and II;

B. Enter a Declaratory Judgment setting forth the rights and obligations of the parties under the Lease and Leases Guaranty on Count III;

C. Grant Plaintiffs an award of attorneys' fees and costs as the prevailing parties in this action.

D. Grant such other relief, legal and equitable remedies as it determines are just and proper.

              Respectfully submitted,

              **PLAINTIFFS,**
              **IHOP LEASING LLC,**
              **DINE BRANDS GLOBAL, INC., AND**
              **FORTY SEVEN EIGHTY ONE**
              **COMPANY, INC.**
              By Its Attorneys,

              */s/Andrea L. Martin*
              Alan E. Lipkind, BBO #547938
              alipkind@burnslev.com
              Andrea L. Martin, BBO #666117
              amartin@burnslev.com
              Taylor M. Makson, BBO #697476
              tmakson@burnslev.com
              BURNS & LEVINSON LLP
              125 High Street
              Boston, MA  02110
Dated:  May 5, 2022        (617) 345-3000